Good morning. My name is Matthew Brissenden. I represent Mr. Medrano. It's undisputed in this case that Mr. Medrano asked his attorney at sentencing to pursue a defense which would have implicated a gentleman by the name of Juan Ordines. It's likewise undisputed that that attorney had previously represented Mr. Ordines in a closely related matter, and it's undisputed that his attorney ultimately declined to pursue Mr. Medrano's preferred strategy. I think this appeal sets up probably three basic questions for the Court. Let me just ask you, tell you my stumbling block, because the claim you're making is not an unreasonable one by any means. But as I see it, as I see it, for two reasons, for at least two reasons, the record as it existed, simply, there simply was no way in which the attorney could have usefully made that argument. And this is for at least two reasons. One is that the evidence that the petitioner advanced about a shipment supervised by the Cucutuca also had this problem of the drugs being locked in the trap that they couldn't open, which he claims that could have been the same shipment. But that shipment was, the evidence of it came from Dominguez, who was the driver, and he was in jail at the time of the shipment that Medina was talking about. So that couldn't have been the same shipment. And furthermore, there's no incompatibility. I mean, even if the other TOCA had had a significant role with respect to the 180-kilo shipment that we're talking about here, that didn't preclude Medrano being involved in it. And Medina's testimony was not based on the notion that the person was TOCA. He was talking about the person that he dealt with. I sat down with this person and discussed the need to send the truck to North Carolina to get at the drugs. I delivered him, after selling those drugs, I delivered the proceeds of a couple of million bucks to him, and I turned over to him an automobile with $300,000 in the trap that was also part of the proceeds. So how could arguing that it was really the other TOCA, how could it possibly have helped? Sure. And you're absolutely right, Your Honor. All of these things are hurdles which would have necessarily had to have been overcome at sentencing to succeed. How could they be overcome? But let me also point out, number one, just to step back and frame the issue. The question is whether Mr. Medrano ultimately would have been successful at sentencing. That's not the standard that I have to meet in this question. If the argument was futile, if it was an argument that couldn't succeed, so there was just no possible value, how can we say that he was adversely affected? My response is this, Your Honor. All of these arguments assume that Medina's testimony was somehow the gospel fact, that it wasn't subject to dispute, that it was basically the one and only version of what occurred, and that defense counsel couldn't seek to attack his credibility or call his account into question. You're absolutely right, Your Honor. If we accept Medina's testimony as gospel fact, that creates problems. But there were a lot of problems with Medina's credibility, Your Honor. Medina was the one and only connection, the one and only evidence, the uncorroborated evidence which tied Mr. Medrano to this alleged shipment. He never discussed the shipment with Mr. Medrano. So what is it that undermines it? Your Honor. I mean, Dominguez's testimony about a truck that Dominguez had that had the drugs locked in the trap, that couldn't have been the one that Medina was talking about. Well, it could not have been if Medina was telling the truth, Your Honor. What I'm saying is that it would have been a reasonable defense strategy.  It's less than reasonable. According to this Court's jurisdiction or jurisprudence, the standard is whether it would have been a plausible or viable alternative to attack Medina's credibility and to argue that this shipment in its entirety wasn't attributable to Medrano. And if you look at the correspondence between Medrano and his counsel, he was asking his attorney to make that argument. He was telling his attorney, this guy is lying. I have nothing to do with the shipment. You need to investigate this other lead. And it's clear that his counsel did nothing to do that, Your Honor. There's this constant theme in the government's I'm sorry. You know, this comes back to, I guess, to how the Court wants to construe Rule 1.9 with professional rules of conduct and the duty of loyalty. And whether or not the Court is inclined to give that rule a very narrow gloss or more expansive gloss. And I think the interpretation which the district court applied here, suggesting that because the former client's case was over, there was no potential adverse impact and, therefore, no more duty of loyalty. I think the district court was simply wrong about that because, I mean, if Medrano could ordain us, if he was involved in that sort of a shipment, even though he had a case concluded, this is another potential liability of his. And there's no reason why he couldn't be prosecuted for it. If it was specially, it wouldn't even be time barred if they could show that it was part of a conspiracy that continued into the present. And in any event, he could be harmed in other ways by being associated with a large narcotics transaction with respect to future prison terms or whatever. So I don't think the district judge was right about that. I certainly agree with Your Honor. And so I think there's no question there was an actual conflict here. And if that brings us to the question of then is there an adverse impact, which was the question you were raising initially, Your Honor. And again, the standard that this Court has set is a relatively low threshold. Was there a plausible or viable alternative defense to pursue here? And this Court has said in Malpiedi and in United States v. Levy, that's not even — doesn't even raise to the standard of was it reasonable. There was certainly an alternative path here that counsel could have taken. He was asked to take that path, and that would have involved attacking Medina and denying that Medrano had anything to do with the shipment and developing this alternative theory, which was a reasonable alternative theory. There was another organization sending tractor-trailer loads of cocaine to the exact same recipient at the exact same time, and there was no evidence in the record tying Mr. Medrano to tractor-trailers. There's no corroboration that he ever had anything to do with tractor-trailers. We have O'Neill who testified on behalf of the government, this gentleman who worked beside Medrano in Chicago at the same — exact same time. And he testified that he knew him as Toka. That is correct, Your Honor. I think there's no question that there are at least two Tokas here, so it's not implausible that he was also referred to as Toka. I think the government's correct about that. But my point is that you have this gentleman in the Chicago conspiracy that somehow doesn't know anything about this massive 180-kilogram tractor-trailer shipment. And so my point is Medina's testimony was a thin, uncorroborated thread upon which the government rested a massive sentencing enhancement. And it would have been a plausible strategy to attack his credibility and to argue that Medrano had nothing to do with that shipment. And that's really all my burden is here in that case, and I would respectfully submit that Mr. Medrano has met that burden. Thank you, counsel. Thank you. You reserve two minutes for rebuttal. May it please the Court. To Frank Medina testified clearly that there was a shipment that occurred after Jesus Dominguez was arrested that was sent to him by Sergio Medrano. And he knew this not because somebody told him that an abstract person known as Toka had done it. He knew this because, as Judge LaValle has already pointed out, he met with Sergio Medrano at a restaurant in the Bronx when the 180-kilo shipment first came in. And Medrano was accompanied at that time by his driver, who Medina described as the Mexican. That's at pages 8, 154 to 155, and A156 about the Mexican being there. After the 180 kilos were delivered, but before the payment was made, Jesus Dominguez was arrested. Or it could be before the 180 kilos. It's unclear because it's in the same month. But certainly before the payment is made, Jesus Dominguez is arrested. I'm sorry, it is before. But after his arrest, Medina sees Medrano again in Brooklyn with the Mexican. That is, with Medrano's driver again. And he pays Medrano $2 million as partial payment for this truckload of drugs. Not only does he pay him $2 million, though, that $2 million comes out of $4 million that he's collected, where he has been instructed, split the money up and give $2 million to the person who the 180 kilos belongs to, and the other $2 million to the Cuco branch of the conspiracy. That is, Ordeños's branch of the conspiracy. That seems to argue that they were sharing the load. Is that it? Well, Judge Hallwell said he didn't know if that meant that they were sharing the load, and he gave Medrano a break at sentencing on the basis of that possibility. What that does eliminate, however, is the possibility that this load belonged to Ordeños, and Ordeños alone, or the Cuco side alone, because if it had belonged to the Cuco side alone, there's no need to split up the money into the money for the 180 kilo load and the money for another drug debt that's already owed to Cuco. Tell me about the break that Mr. Medrano got in sentencing, if only a half a load was attributed to him. That's right. At sentencing, Avram Rabin chose to argue that because Medrano had only been paid for approximately half of the load, one reasonable inference that the judge could take is that the load actually belonged to both branches of the conspiracy. That is, both the Cuco branch, the Ordeños branch, so he wasn't trying to exculpate the Cuco branch, and Medrano's branch of the conspiracy, that is, the Chicago branch. And as such, Judge Hallwell should only tag him with no more than half of the load, because that's all that he was paid for. We argued that that was incorrect, but the judge ultimately said, yes, I'm going to go with that. I'm going to say because I find Medina wholly credible, and let me be clear, Judge Hallwell found Medina to be credible after thorough cross-examination, but because I think that the actual ownership of the load, as opposed to who brought it, was something that he only knew secondhand from Johan Moreno, and there was the split of money, I'm going to give Medrano the benefit of the doubt and say he was only responsible for the half he was paid for. I'm sorry, yes. If he's only attributed 54 kilograms, it's the same drug weight that yields the same sentence at level 36, isn't that correct? That's correct, Your Honor. So what kind of break did he get? Because if he had been attributed the full 180 kilos, he would have been 38. I thought it was based on more than 50, but not more than 150. That's right. The break was that Judge Hallwell only held him responsible for 90 kilos of the 180 kilos in the truck. Had Judge Hallwell found him responsible for the full 180 kilos, he would have popped up into the highest level, which is level 38, which is 150 kilos and above. Judge Hallwell held him responsible for 50% of the 180 kilos, which is 90 kilos, and he said, and we agreed, that if you add up the other shipments that we had of the other shipments, you get 150, and therefore he was in level 36 instead of 38. And just to continue with your point, Mr. Mahamud, then he wasn't held responsible for 180, which is above 150, which gets you to the next level. Absolutely. Which is, I think, what Judge Pooler was asking about. That's absolutely right. So that was the break that he got on that was that he was held responsible for only half of the load. Mr. Robin also got him additional breaks. For example, despite the fact that Judge Hallwell found that Medrano had lied at both the suppression hearing and at the Fatico hearing, where at the Fatico hearing, by the way, his testimony was effectively that despite pleading guilty, he had really committed no crime, he was still given full acceptance of responsibility of two points as well. But because of this, the alternative defense that Mr. Brizenden now forwards, which is a little different than the defense that Medrano sought to put forward below, simply wasn't plausible. There's two ways to look at it. Either Medina was confused or Medina was lying. If Medina was confused, as Judge LaValle pointed out, the alternative defense doesn't help because the facts that Medina knew pointed directly to Medrano because he saw Medrano. He called him Tokacs. That's the only name he knew him by. But he said, that's the man who was sitting at the restaurant. That's the man who I paid the money to. I went into a McDonald's. He was sitting with Moreno. I went over. I spoke to them. I then had my brother bring him the $2 million because Medina didn't bring the money with him. His brother brought the money to the McDonald's. That is, it wasn't a point of confusion. And if it's that Medina was lying, then none of this adds anything to that mix because Medina, in theory, could make up anything about anybody. The fact that there is somebody else who has a common nickname in Spanish doesn't undermine Medina's credibility in any way. So ultimately, this was simply an implausible defense. And as such, Mr. Medrano cannot meet the requirements of actual conduct. Kennedy. Let me ask you a question. What would the posture of this case be now if the district judge had said to counsel for Medrano, new counsel for Medrano, after Robin is gone, the conflicted Okay, I'm the district judge. I have control over his sentence. Argue to me. Do what you say Robin should have done. Make your best pitch to persuade me that he's not responsible for this shipment. And had heard the argument and then, let's say, had reached the conclusion that that argument fails, what would the posture of the case be right now if that had been added to what was done in the district court, and we were all here arguing it now, how would it affect the posture of this case before us? Well, other than the 2255 going away because you wouldn't have this issue of, I don't want to say potential actual conflict. No, I'm sorry. I'm saying this is the 22. I'm talking about on the. I apologize, Your Honor. I misunderstood. This is the appeal, right? No, this is the appeal of the 2255, Your Honor. Yeah, okay. So, and the judge, I'm talking, that's what I'm talking about, the appeal of the 2255. If the judge had given counsel the opportunity to make the argument that, to make the argument that counsel argues Robin should have made. Well, presumably, if the judge below had found the 2255, appointed Mr. Brizenden or somebody else from the CJA panel to represent Medrano, and the argument had failed, the judge would impose new sentence, and Medrano may face a stiffer sentence because Judge Swain, I think, on a de novo resentencing there, wouldn't be bound by the breaks that Judge Hallwell decided to give Mr. Medrano. So, effectively, it would be a new sentencing and. But on the 2255, asking for a new sentence, if the court, if the court permitted counsel to make the argument that Medrano is arguing should have been made at the time of his sentencing, and the argument is made and the judge says, well, I've heard that argument now, and it fails. I think that, nonetheless, the judge would have to impose a new sentence, which could be the exact same as the old one. But if the judge were to have found an actual conflict below, I believe that because the damage to Medrano, at least in theory, is not the effectiveness of the representation, but rather is the fact that he was represented by conflicted counsel and he has a right to be represented by unconflicted counsel at the sentencing, I believe he would still have been entitled to a de novo sentencing, one at which this argument would have failed. And, again, I can't get inside the mind of Judge Swain, but among other things, he would face a higher sentence as well as a lower one, or exactly the same as Judge Hallwell had originally imposed. I hope that that answered the question. I hope I didn't misunderstand it too poorly. But for those reasons, we don't think that there is, in fact, an actual conflict here because there simply wasn't a plausible alternative defense. Those are different issues. There could have been an actual conflict, and still there could be no alternative plausible theory. Well, the reason why I say that is under the language that the courts have come down with respect to per se conflict, actual conflict. I think there was an actual conflict, but then the burden is on Mr. Medrano to show an alternative plausible theory. That's absolutely right. The only reason I'm phrasing it that way is that how the courts have said it is that the plausible alternative theory is part of finding that there is an actual conflict. I think that how the courts below have said it would be that there was an inherent conflict, and then to determine whether it's an actual conflict, you have to find that there was a plausible alternative defense. It's a nomenclature issue. I think that we're together on how the process works. Banus could have gotten some relief, though, in jail. He could have won a resentencing on all sorts of issues, and then there would be an actual conflict. I can foresee a situation where that would happen. But as you argue, that wouldn't make a difference if there wasn't an alternative plausible theory. Absolutely, Your Honor. That's 100 percent correct. Thank you. There are no further questions. Thank you. Mr. Bresenden. Just very briefly, I know the Court is focused in part upon the timing of these deliveries. I think when I heard the government stand up, they sounded confused themselves as to exactly what the timing of this delivery is and whether it took place before or after Mr. Domingos was arrested. But more to the point is, it's not like Medina marked this down in his day calendar. This is a gentleman testifying six years after the fact. And of course, you know, even if we assume he was seeking to tell the truth, I think it's fair to assume that he was estimating these things or using his best recollection. The government also focuses on this alleged payment to Mr. Medrano in Brooklyn. I think the other thing that's important to recognize is that there was testimony of much smaller shipments made, for instance, at this exact same time by Mr. O'Neill driving a trapped Mitsubishi Montero in late December, making a shipment to Johann to Mr. Medrano at the same time. And so what is the payment for that Medina sees? Is it really the payment for this 180-kilogram shipment? Does he really have all the information necessary to make that judgment and report that to the Court? This is a person who had been working in this organization for three months, and suddenly he's privy to all this information about exactly the ongoing, what's going on here. If you look at the government's initial indictment in this case, they set forth in the indictment that the payment was for $1.5 million. And suddenly, when the Fatico hearing comes, the witness gets up and testifies that it's $2 million. Those are both the awfully round numbers, which suggests to me that you don't have a witness who knows exactly what he's talking about, but he's throwing things out there and seeing what sticks, and he's working to get a cooperation. There was every incentive to discredit Medina, who was the source of this information. But that doesn't, you know, saying that Medina is lying and is falsely implicating Medrano as the person to whom he gave $2 million that came out of the, came from the proceeds of the drugs in the trap, and is lying when he says that he gave him the automobile, turned over to him the automobile with the money. That has nothing to do with the existence of another TOCA who counsel represented in the past. But what is important is, does Medina know what he's talking about when he says, this 180 shipment, kilo shipment came in, and I know, I'm the one that can tell you that it's attributable to Mr. Medrano. Does he really have that information? He said I turned over the money to Medrano that was the proceeds of that shipment, and I met with Medrano to discuss the need to take it to North Carolina. Now, of course, you're right that he could have been lying about all that. He might have a motive to lie to help himself and whatever, but it has nothing to do with the fact that there's a TOCA in the CUCO organization that he represented in the past. I just want to be slightly careful, because I don't think Medina ever testified that he had any type of interaction whatsoever with Mr. Medrano. What he said basically is that he's a bystander to these transactions that are going on, and then he hears secondhand from his boss that this has to do with that 180-kilogram shipment. Mr. Medina never even sees inside the truck that allegedly carries this 180 kilograms. Am I mistaken? I thought Medina testified that he turned, that he sold the proceeds after the drugs had been liberated from the truck, that he sold them and he turned the proceeds over to Medrano. What he said was this. This truck comes into New York. It parks in the Bronx. They can't get in it. He never sees Mr. Medrano with the truck. He sees Mr. Medrano in New York at the same time, but not with the truck. He doesn't see inside the truck because they can't open it. And then he hears that the truck goes away. He hears that it's taken to another State, and somehow he receives 80 kilos at some point in the future, and it's his understanding it's from that shipment. But there's, he doesn't see the drugs coming out of the truck. He's not privy to how the drugs came out of the truck. But he does say, does he not say that he turns the $2 million over to Medrano? He says he's at a meeting where he arrives at the meeting with $2 million, and then his brother turns over the proceeds to, I think, somebody who worked for Mr. Medrano or Mr. Medrano. But again, you know, why is it 1.5 million in the indictment, and suddenly it's 2 million when he testifies? It's got to do with confusion about two tokas. It has to do with whether this gentleman actually knew what was going on in these transactions or whether he was speculating. The conflict only has to do with the two tokas. Well, it has to do with which branch of the conspiracy this shipment was attributable to, whether it was Kuka and Toka or whether it was Mr. Medrano. And if this gentleman doesn't really have the basis to be making that judgment, he could have been attacked. This could have been a strategy which Mr. Medrano's attorney could have legitimately pursued, a viable, plausible strategy. There's a lot of suggestion that this was a strategic decision made by the attorney, that he simply judged, after looking at it, I'm going to pursue this other, more plausible theory. I would invite the Court to look at the attorney's affidavit, because he doesn't say anywhere in there that, upon having my client tell me that these drugs were actually attributable to another branch, another part of the conspiracy, I conducted an investigation into this claim. I weighed the facts and I made a judgment. It simply wasn't credible. There's no – there's no evidence in the record that he undertook any type of good-faith investigation like that. And short of that, to cast this as a strategic decision I just don't think holds water. Ginsburg. Thank you, counsel. Thank you very much. Thank you both.